**BOARD OF MONTGOMERY COUNTY COMMISSIONERS, Plaintiff, v. UNKNOWN HEIRS etc., Defendants.**

Common Pleas Court, Montgomery County.

No. 96079. Decided April 25, 1947.

Mathias H. Heck, Pros. Atty., Albert J. Dwyer, Asst. Pros. Atty., Dayton, for plaintiff-appellee.

Eugene G. Kennedy, Miles S. Kuhns, Heber S. Leonard, Otterbein Creager, Howard P. Williamson, Roy G. Fitzgerald, William M. Pettit, Dayton, for defendant-appellants.

## OPINION

By MILLS, J.

This is an action filed by the Board of County Commissioners of Montgomery County, Ohio, praying that the title to lots 131 and 132 of the consecutive numbers of lots on the revised plat of the City of Dayton be quieted and for such other and further equitable relief as may be granted.

The matter comes on to be heard before the court on the petition of plaintiff herein, the answers of defendant, the City of Dayton; the answer of intervening defendants, J. P. Seybold, Ellen M. Smith, Harry W. Binegar, Sebastian Ruel and George B. Wetzel, claiming an interest in the premises described in the petition and as friends of the court, in behalf of themselves and all other citizens and residents of Montgomery County; it appearing to the court that the unknown heirs, devisees and legal representatives of the estate of Sophia Lowry, deceased, of Daniel Cooper, deceased, and Letitia Bacus, deceased, having been duly served by publication, have filed no answer, plea, nor made an appearance herein.

The defendant, the City of Dayton, claims a future right of reversion or forfeiture in said lots by reason of a quit

claim deed of July 1872, for a valuable consideration, from the heirs of Daniel C. Cooper, and by reason of a quit claim deed of January 1873 from the trustees of Letitia C. Bacus, widow of David Z. Cooper.

Defendant, J. P. Seybold, Ellen M. Smith, Harry W. Binegar, Sebastian Ruel and George B. Wetzel, in behalf of themselves and all other citizens and residents of Montgomery County, Ohio, claim a vested interest in said lots by virtue of a dedication by Daniel C. Cooper, of lots 131 and 132, for a court house, jail, etc., by a plat which said defendants claim was accepted by the duly qualified and acting county commissioners of Montgomery County, Ohio, in 1805.

To the answer of the intervening petitioners, plaintiff herein filed a general denial.

Thé court, after careful consideration of all the evidence adduced at the hearing, the briefs and arguments of counsel, and after consideration of the law applicable thereto, finds the following:

That on April 27th, 1802, Israel Ludlow certified for Daniel C. Cooper that a certain plat was a true copy of the original plat of the Town of Dayton, then Hamilton County, Ohio; that same was filed for record April 28th, 1802 in Deed Record E-2, page 40, Hamilton County, Ohio; that a subsequent plat of Daniel C. Cooper, dated September 5th, 1803, was filed for record in Montgomery County September 9th, 1805 and recorded in Deed Book B, page 1. The first constitution of the State of Ohio was adopted at Chillicothe, Ohio, November 29th, 1801, and Ohio was admitted to the Union as a state in 1803. That attached to said plat filed in Montgomery County as of record on September 9th, 1805, was an explanation of lots 131 and 132 to be used for the court house, with the following certificate: "I do hereby certify the above explanation and reservation are correct with respect to the Town of Dayton."

On April 2nd, 1804, an election was held for county commissioners. The following commissioners were elected: Edmund Munger, John DeVoe, and William Browne, and the first session or meeting of the county commissioners was held at the Newcom Tavern on June 11, 1804.

Montgomery County, at that time, included the territory now in Preble, Montgomery and a portion of Clark counties, and extended north to the state boundary line.

On June 27th, 1805, Daniel C. Cooper and the county commissioners, entered into an agreement wherein it was stipulated that the conditional agreement, which included the offer to dedicate lots 131 and 132, dated September 5th, 1803,

had not been accepted, and that because of non-acceptance by the county commissioners, the agreement dated June 27th, 1805, and filed for record September 9th, 1805, recorded in Deed Book B, page 3, was entered into between Daniel C. Cooper and the county commissioners.

The agreement recites that the aforementioned offer had not been accepted, and a further condition was that the aforesaid offer was considered to be null and void, and in this agreement Daniel C. Cooper agrees in consideration that the aforesaid agreement may be made null and void binds himself to make a good deed to the commissioners and successors in office for the county as soon as he obtained title from the United States for the town tract, among them lots 131 and 132 for the court house, jail, etc., etc. There are other obligations placed on the county commissioners wherein they were to carry out previous conditions.

On July 18th, 1812, Daniel C. Cooper received his patent for the town tract from the United States government, which was filed for record February 9th, 1813, and recorded in Deed Book C, page 47 of Montgomery County records. Acting in accordance with the agreement, Daniel C. Cooper, on November 26th, 1813, deeded lots 131 and 132, among other property, for a court house, etc., etc., to the county commissioners of Montgomery County, their successors in office and assigns forever. This deed was filed for record on January 7th, 1814, in Deed Book C, page 256, in the Deed Records of Montgomery County, Ohio. In this deed Daniel C. Cooper, in referring to lots 131 and 132 and other lots and the purpose for which they were deeded, refers to his agreement of June 27th, 1805, with the county commissioners and specifies it as recorded in Deed Book B, page 3, of the Deed Records of Montgomery County, Ohio.

The first question considered by the court is: Did the county commissioners take the title for the uses and purposes of a court house and jail, etc., etc., by reason of a dedication and acceptance, or did they take title by the deed dated November 26th, 1813, recorded January 7th, 1814, in Deed Book C, page 47, of the deed records of Montgomery County, Ohio, from Daniel C. Cooper and his wife, Sophia Cooper, as provided in the contract dated June 27th, 1805?

Intervening defendants are relying solely on a common law dedication, or dedication under the Territorial Laws. At the time of the claimed dedication there were no statutes in effect in the State of Ohio, providing for and defining dedication. Referring to 16 American Jurisprudence, Article 16,

under "Contractual Analogies" and "Dedication Generally," it is held:

"Neither a written grant nor any particular words or ceremonies, or form of conveyance, are necessary to render the act of dedication of land to public uses effectual at common law. Anything which **fully** demonstrates the intention of the donor and the **acceptance** by the public, works the effect. Words are unnecessary if the intent can be gathered from other sources. It is sufficient if the owner's **intention,** and **express act** coincide; dedication will then be effective immediately on its **acceptance** by the public."

Under Article 49, at page 375 of 16 American Jurisprudence, under the subject of "Withdrawal:"

"In general, the proprietor may revoke or withdraw his offer of dedication, in whole or in part, at any time before it is accepted by the public or its representatives and before the rights of private persons have intervened."

Lots 131 and 132 are not shown upon the drawing of the original plat filed for record September 9th, 1805 and dated September 5th, 1803. However, there is an open space marked on the plat consisting of eight lots where lots 131 and 132 are now numbered on the plat. An explanation is attached stating lots 131 and 132 are for the court house. Prior to the recording of said plat, to wit, on September 9th, 1805, an agreement between Daniel C. Cooper and the county commissioners was entered into. The plat and the agreement were filed simultaneously for record on September 9th, 1805. The plat of 1803 recorded in Hamilton County does not specifically name lots 131 and 132 but the blank space of eight lots is shown as public grounds.

In the absence of any evidence of an offer to dedicate, other than the drawing of the plat and the recording thereof in Hamilton County, there being no further evidence of an offer to dedicate to the public for public uses, the court finds there was no evidence of an acceptance of any prior offer to dedicate up to the time of the election of the county commissioners in 1804. The court finds there is no evidence as to the acceptance by the county commissioners after their election and qualification. We must look to the agreement dated June 27th, 1805 between Daniel C. Cooper and the county commissioners; therein it is recited in the second paragraph:

"That the said Daniel having heretofore made certain proposals for granting lots to the county and other property for and in consideration of having the seat of justice established at Dayton which has not been accepted by the judges and the said lots have not been sold for the county whereby the value of the lots would have probably been augmented to the advantage of the said Daniel and the parties hereto subscribing on their respective parts being willing to settle and compromise the aforesaid agreement have agreed as follows, to wit:

"That in consideration of all the aforesaid agreement being made null and void the said Daniel hereby grants and conveys and binds himself to make a good deed to the commissioners and to their successors in office for the county as soon as he obtains one from the United States for the town tract for the following lots numbered on the plat of the said town as follows: 131 and 132 for a court house and jail, etc., (naming other lots for burial ground, for religious purposes, and several other lots to be sold for the use of the county) one fourth by the first of November next and with a condition binding the purchaser to build and improve on them in one year, the remainder to be sold in four years and the commissioners agree on their part for and in the behalf of the county that the said Daniel shall be hereby exonerated and discharged from all the proposals and subscriptions made by him to the use of the county before the date of these presents and the fullfilment of all and every of the engagements and stipulations herein set forth the said Daniel C. Cooper binds himself, his heirs, executors, administrators and assigns on his part and the said commissioners bind themselves and their successors in office in behalf of the county."

It must be remembered that there was a condition in the proposals entered into for granting lots to the county and other property prior to the agreement of June 27th, 1805. That having been signed by Daniel C. Cooper and the county commissioners, and the condition recited in the contract is "in consideration of having a seat of justice established in Dayton;" reciting further that the offer had not been accepted by the judges, and that the other lots proffered had not been sold for the county, whereby the value of the lots would have been augmented to the advantage of said Daniel C. Cooper, it is apparent that the proposals and offers that the agreement says "have not been accepted," was a promo-

tional idea on the part of Daniel C. Cooper to augment the value of the land on condition that Dayton would be selected as a county seat and on further condition that if it were selected as a county seat, the to be elected county commissioners, after the judges had selected it as a county seat, would further sell other outlying lots to further increase the value of real estate owned by Daniel C. Cooper at the time in Dayton. (It is to be remembered that there was a rival town already established in Montgomery County that might have been selected as the county seat, a little village long since deserted, lying in the hills off the Whipp Road, between Alexandersville and Centerville, and called Woodburn.) This agreement further said "Daniel C. Cooper further binds himself to make a good deed to the commissioners and their successors as soon as he obtains one from the United States for the town tract," and transfer to said county commissioners for the uses and purposes mentioned in the agreement by the most solemn instrument of conveyance, to wit, a deed.

It follows thereafter that Daniel C. Cooper did receive a patent dated July 18th, 1812 from the United States, which was filed for record February 9th, 1813, which was recorded in Deed Book C, page 47, in the records of Montgomery County. Pursuant to his agreement he executed and delivered a deed to the county commissioners of Montgomery County, on November 26th, 1813, in which his wife, Sophia, released her right and expectancy of dower, and the same was filed for record January 17th, 1814, and recorded in Deed Book C, page 256 of the records of Montgomery County, Ohio. This is the solemn instrument by which the court finds that the county commissioners, their successors in office and assigns, obtained title to lots 131 and 132 in the City of Dayton, Ohio, which is the subject of this action to quiet title thereto.

Describing among other properties, lots 131 and 132, the deed recites:

"That this indenture made this twenty-sixth day of November in the year of our Lord one thousand eight hundred and thirteen between Daniel C. Cooper and Sophia, his wife, of the county of Montgomery of the one part and the County Commissioners of the same county of the other part, witnesseth:

"Whereas the said Daniel C. Cooper as proprietor of the town of Dayton in the said county, among other donations of ground for public purposes, did describe, set apart and give in-lots numbered on the plat of the said town of Dayton one hundred and thirty-one and one hundred and thirty-two for

the court house etc., etc., (describing other lots for other purposes), as will appear more fully in and by the records of Montgomery County, Book B, page 3."

The granting clause in said deed recites:

"Therefore this indenture witnesseth that the said Daniel C. Cooper hath given, granted, aliened, conveyed and confirmed and by these presents doth give, grant, alien, convey and confirm unto the said county commissioners, their successors in office and assigns forever, to and for the uses and purpose aforesaid, all the above described lots.

"To have and to hold the said granted premises with all the privileges and appurtenances to the same belonging as in any wise appertaining to the only proper uses, benefits and purposes above mentioned.

"And the said Daniel C. Cooper for himself, his heirs, executors and administrators, doth covenant, grant and agree to and with the said county commissioners, their successors in office and assigns, by these presents that they, the said county commissioners, their successors in office and assigns, to and for the uses and purposes above mentioned shall and may from time to time and at all times forever hereafter by force and virtue of these presents lawfully, peaceably and quietly have, hold, use, occupy, possess and enjoy the said granted and confirmed premises, with all the appurtenances, free and clear and freely and clearly acquitted, exonerated and discharged of and from all and all manner of other or former gifts, grants, sales or incumbrances of what name or nature soever that might in any measure or degree obstruct or make void this present deed.

"Furthermore the said Daniel C. Cooper for himself, his heirs, executors and administrators, doth covenant and engage the above granted and confirmed premises to them, the said county commissioners, their successors in office and assigns, against the lawful claims of any person or persons whatsoever forever hereafter to warrant, secure and defend by these presents."

The deed appears upon its face to have been properly executed by the grantor, Daniel C. Cooper, and his wife, Sophia Cooper. It is witnessed by two witnesses and acknowledged before the proper officer.

It will be observed that the deed from Daniel C. Cooper and his wife, Sophia Cooper, to the board of county com-

missioners of Montgomery County, Ohio, contains no provision for forfeiture or reversion.

It is held in **First Presbyterian Church of Salem, Appellee v. Tarr, et al, Appellants, 17 O. O. 57,** and cited November 1st, 1939:

"A devise of real estate to a religious society 'to be used as a parsonage,' but with no provision for forfeiture or reversion, conveys all of the estate the testator had therein to the devisee, and the failure of the devisee to use and property as a parsonage will not cause the title to revert to the heirs of the testator.

"The mere statement in a will of the purpose for which property devised is to be used, will not be regarded as a condition subsequent, so as to debase the fee when the condition is broken, unless the intention of the testator is clearly shown to be otherwise."

The same principle is upheld in **58 Oh St 67, The Village of Ashland v. Greiner, et al,** where it is held:

"That as said deed had no words of forfeiture or re-entry, the diverting of said lands to uses and purposes, other than those expressed in the deed, did not in legal effect revest title to said lands in the grantor, or his heirs."

An opinion to the same effect is expressed in **8 Oh Ap 356,** in the case of **Larwill v. Farrelly:**

"The use in a deed of general warranty of the words 'for the use and sole purpose of the Catholic church and such other erections as may be needed for the use of said Catholic church', does not constitute a condition subsequent or engraft a limitation upon the title, but at most is a mere suggestion or unenforceable **request or desire.**"

In **First New Jerusalem Church of Lakewood, Appellant, v. Singer, et al., Appellees, 22 O. O. 217,** in quoting from **Copps Chapel Methodist Episcopal Church, 120 Oh St 309,** it is held:

"Where a quit claim deed, for valuable consideration conveys to trustees of an unincorporated church, association, certain real property, 'to have and to hold * * * unto the said grantees and their successors * * * so long as said lot is held and used for church purposes', without any provision for forfeiture or reversion, such statement is not a condition

or limitation of the grant. Since the deed contains no provision for reversion or forfeiture, all of the estate of the grantor was conveyed to the grantees."

The fourth syllabus in First New Jerusalem Church of Lakewood v. Singer, reads:

"Such a deed conveying the land to the 'trustees' and their successors in office forever, to be held in trust for the church, and providing that the 'land is to be returned to the original owners' in the event that it should ever cease to be used for church purposes, conveys an absolute fee simple title to the trustees."

Syllabus five reads:

"In such case, the grantors must, in order to create a reverter or forfeiture of the estate reinstating the fee in them or their heirs, use words in the reverter clause of equal dignity and force to those of the grant, embodying the conception of perpetuity and succession."

Quoting from **First Presbyterian Church v. Tarr, 17 O. O. 61:**

"To create a condition in a grant, apt and appropriate words ought to be used, or a right of re-entry be reserved; a mere expression of purpose for particular uses to which the property is to be appropriated is not sufficient. * * *

"A condition will not be raised by implication from a mere declaration or recital in an instrument that the grant is made for a particular or certain purpose, unless it is coupled with words clearly showing upon their face such a condition, such as words indicating that the grant is to be void and the property to revert if the declared purpose is not carried out. The most that can be claimed for such recitals or statements is that they might be construed as the expression of a mere wish or desire on the part of the grantors to have the property used for the purposes indicated; but in effect they are mere suggestions, unenforceable requests, or desires.

"Conditions which in any way have a tendency to destroy or lessen estates are not favored by the law; such conditions are strictly construed, and all doubts are resolved against them in such way as to have the grant, and not to defeat it,

even, it is said, to an extent hardly reconcilable with conscience, because on the breach of such conditions there is a forfeiture, and the law is adverse to forfeitures."

It is evident that nowhere upon the face of the deed from Daniel C. Cooper to the county commissioners is there evidence of words of forfeiture or reversion to the estate of Daniel C. Cooper, his heirs or assigns. There is no condition subsequent engrafted therein. There is a provision, however, that upon condition that the county commissioners accept other lots to sell in order to augment the value of lots in the town of Dayton to Daniel C. Cooper upon the further condition that the town of Dayton is chosen as a county seat, that lots 131 and 132 pass to the county commissioners, its successors in office and assigns for a court house and jail purposes and so forth. It is apparent that all of the conditions in the grant from Daniel C. Cooper to the county commissioners have long since been complied with.

Applying the law heretofore laid down by the Supreme Court of the State of Ohio to the evidence before this court, it is the conclusion of the court that the deed from Daniel C. Cooper and Sophia Cooper, his wife, to the county commissioners of Montgomery County conveyed an absolute fee simple interest, subject to no restrictions, to the county commissioners for a valuable consideration and that the deed from the Cooper heirs to the City of Dayton, copies of which were introduced in evidence and dated in 1872 and 1873, conveyed no interest whatsoever to the City of Dayton, because the Cooper heirs had no interest, either present or future, to convey.

The court finds that the prayer of plaintiff's petition to quiet title as against all defendants herein should be granted.

### DECISION ON MOTION FOR NEW TRIAL

No. 96079.  Decided May 28, 1947.

Mathias H. Heck, Pros. Atty., Dayton, for the plaintiff.
Herbert S. Beane, City Atty., Dayton, for the City of Dayton.
Wm. A. Pettit, Dayton, for intervening defendants.

### OPINION

By MILLS, J.

This cause comes on to be heard upon the motion of defendants, Seybold, Smith, Binegar, Ruel and Wetzel, by their

counsel of record, moving the court that the decision rendered in this action be vacated and a new trial granted, setting forth four specific reasons for said motion.

The court will consider the second reason first:

"2. Error in interpretation of the law in finding that the Cooper plat dated 1803 and accepted by the County Commissioners and recorded when first real estate records of Montgomery County were opened in 1805 was a common law plat, instead of a plat dedication under the territorial law, which said territorial law continued as the Ohio law when statehood was attained in 1803."

The court has again examined Volume 2, page 41 of the Laws of Ohio, dated 1800. It is true there was a penalty for failure to record a plat within one year, as provided by the Territorial Laws, but the court is without any evidence upon which to base an opinion as to whether or not that penalty was ever inflicted upon Daniel Cooper. The court can find nothing in the Territorial Law which says that the penalty was or was not inflicted, but if the duly executed plat was not filed and not accepted, that there would be a dedication.

The court will refer again to the law of dedication as set out in the opinion:

"Anything which **fully** demonstrates the intention of the donor and the **acceptance** by the public works the effect. Words are unnecessary if the intent can be gathered from other sources. It is sufficient if the owner's intention and express act coincide; dedication will then be effective immediately on its **acceptance** by the public."

Going on further:

"In general, the proprietor may revoke or withdraw his offer of dedication, in whole or in part, at any time before it is accepted by the public or its representatives and before the rights of private persons have intervened."

We have no evidence of dedication of the plat of 1803, filed September 9, 1805; the only evidence we have before us, however, is the filing of the plat September 9, 1805, together with the contract, with the county commissioners dated June 27th, 1805, and referring to the plat of 1803. Both the plat and the contract were filed for record at the same time, and it is from the contract and the plat filed as of September 9th,

1805, that the court bases its opinion that the county commissioners, or the public, accepted lots 131 and 132, subject to the making of a good deed at a later date, to wit, when Daniel Cooper had received his patent from the government. After receiving his patent from the government Daniel Cooper made the good deed and filed it of record and complied with the conditions of the contract with the county commissioners.

The plat of 1802—if it may be called a plat, it is marked "plan"—was filed in Hamilton County, was not duly executed according to the provisions of the Territorial Law. Reference was made to the revised plat of January 3, 1809 and filed for record January 4, 1809, recorded in Deed Book B page 147. That was an alteration of the plat of 1803 which refers to the plat filed February 9, 1805 by the Act of Legislature, dated February 17, 1808, recorded in Volume 6, page 140 of the Laws of Ohio, which reads:

"An Act, authorizing the proprietor of the town of Dayton in the county of Montgomery to change the plan of the same.

"Sec. 1. Be it enacted by the general assembly of the state of Ohio, that the proprietor of the town of Dayton in the county of Montgomery is hereby authorized to alter, amend, or correct the plat of said town with the approbation of a majority of the county commissioners and the trustees of the corporation of said town: Provided that no block of lots shall be vacated in which any individual shall have a claim without their consent.

"Sec. 2. And be it further enacted, That the plat of said town, so amended, and recorded, shall be as valid as the original: Provided, the same shall be done in twelve months after the passage of this act.

> Philemon Beecher,
> Speaker of the house of
> Representatives.
> Thomas Kirker,
> Speaker of the Senate."

Accompanying the plat of 1809, and pursuant to the authorization of the State Legislature, the following explanation of the plat was made:

"Out-lots to remain agreeable to the original record.
> D. C. Cooper

"Wilkinson Street 4 poles wide and the western boundary of the town lots. Third Street west of the town lots 6 poles wide.

"Lots numbered 94, 95, 96, 97, 98, 99, 100, 141, 142, 143 and 144 for the use of the town as a common.

"We, the subscribers, do hereby certify that the above plan is a true representation of the town lots and streets, etc., of the Town of Dayton.

"And under the restrictions of a law passed the 17th of February 1803 we do hereby agree that the original plan be so vacated and amended as is herein specified and it is agreed that the proprietor shall have the privileges contained in the original record and that all advantages not expressly given remain with the proprietor.

"Given under our hands and seals this 3rd day of January 1809.

| | |
|---|---|
| James Welsh | John Folkerth (Seal) |
| Hugh McCallem | Daniel Hoover, Jr (Seal) |
| Wm. McGlure | |
| B. Van Cleve | Commissioners." |
| Isaac G. Burnet | |
| Members of Council. | |

It will be noted that there is nothing in this amended plat of 1809 that changes, in any manner whatsoever, the plat of 1803 filed September 9, 1805 with the contract with the county commissioners. The lots numbered in the explanation above quoted evidently are part of the Cooper Park, now occupied by the public library. Surely no one can contend that there is a dedication of lots 131 and 132 by virtue of the filing of the amended plat of 1809. The explanation, reference to other lots and the width of Wilkinson Street and Third Street, speaks for itself.

It is the opinion of the court that Territorial Laws do not abbrogate the right of a contract between individuals, corporate bodies, or the right of contract between individuals and counties through their authorized representatives.

In considering number three of defendants' notion:

"Surprise which ordinary prudence could not guard against by reason of the loss of, or disappearance from custody of the official records of Montgomery County commissioners official records for years from 1803 to 1815 which covered the courthouse lots acts, and which said records are material to the issues involved."

The court cannot consider something that is not intro-

duced into evidence, nor can it speculate what such official records, if there ever were such records, contained.

As to the fourth branch:

"That no lawful service was made on Letitia Backus,"

the court is of the opinion that lawful service was made upon Letitia Backus, if living, and her heirs, if any are living.

Considering number one,

"That the findings of the court are not sustained by the evidence of records and are contrary to law,"

the court refers counsel to the original opinion in this case, in which the reasoning of the law is thoroughly set forth.

The court is of the opinion that the motion of the defendants for a new trial should be overruled.

CECIL and THOMAS, JJ, concurring.